```
                                                    USDC SDNY
                                                    DOCUMENT
                                                    ELECTRONICALLY FILED
UNITED STATES DISTRICT COURT                        DOC #:
SOUTHERN DISTRICT OF NEW YORK                       DATE FILED: 12/15/08
------------------------------------------- x
GEORGE DILACIO, JR.,                        :
                                                    08 Civ. 6959 (CSH) (THK)
                          Plaintiff,        :
                                            :
       -against-                            :
                                            :
NEW YORK CITY DISTRICT COUNCIL OF           :       MEMORANDUM OPINION
THE UNITED BROTHERHOOD OF                   :
CARPENTERS & JOINERS OF AMERICA,            :
and MICHAEL J. FORDE, personally and        :
WILLIAM P. CALLAHAN, personally,            :
                                            :
                          Defendants.       :
------------------------------------------- x
```

Plaintiff George Dilacio, Jr., a member of Local 157, a constituent local of defendant New York District Council of the United Brotherhood of Carpenters & Joiners of America ("the District Council" or "the Union"), has brought this action against the District Council, defendant Michael E. Forde, the District Council's Executive Secretary/Treasurer, and defendant William P. Callahan, the president of Unitel Intelligence Group, Inc. ("Unitel"), the Independent Investigator ("II") appointed by this Court.

In an opinion reported at 2008 WL 4449361 (S.D.N.Y. Sept. 29, 2008) ("*Dilacio I*"), familiarity with which is assumed, the Court denied Dilacio's motion for a temporary injunction. *Dilacio I* fully sets forth the circumstances giving rise to plaintiff's action against these defendants, which are not reiterated here.

The District Council and Forde (sometimes collectively "the Union Defendants"), represented by the same counsel, and Callahan, represented by different counsel, moved to dismiss

1

Dilacio's Amended Complaint against them pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. On December 3, 2008, the Court entered an Order granting the motions of all the defendants. Given the exigencies of time, in particular a Union election scheduled for later this month, the Court stated in its Order that the Opinion explaining its reasons would be filed subsequently. This is that Opinion.

## I. STANDARD OF REVIEW

A complaint is subject to dismissal under Rule 12(b)(6) if it fails "to state a claim upon which relief can be granted." The Rule does not further define that phrase. In *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), the Supreme Court referred to "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*'s "no set of facts" standard became talismanic. The lower federal court decisions quoting and attempting to apply it are legion. Indeed, the brief for plaintiff Dilacio in the case at bar at 2 relies upon the "no set of facts" standard, citing a district court case decided in 2002 and a Second Circuit case decided in 1996.

However, in 2007 the Supreme Court decided *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955 (2007), which abrogated *Conley's* oft-cited standard. The *Twombly* Court explained that a literal application of *Conley*'s "no set of facts" rationale is improper because "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." 127 S.Ct. at 1968. Instead, the Court emphasized that "[f]actual allegations must be

2

enough to raise a right to relief above the speculative level," *id.* at 1965, and to survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim that is plausible on its face." *Id.* at 1974.

The Supreme Court may have intended its decision in *Twombly* to settle once and for all the standard applicable to Rule 12(b)(6) motions to dismiss. However, *Twombly* seemed somewhat less than clear to the Second Circuit, which in *Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007), undertook to interpret the Supreme Court's decision and restate the standard. The Second Circuit said in *Iqbal*: "After careful consideration of the Court's opinion [in *Twombly*] and the conflicting signals from it that we have identified, we believe the Court is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible* ." *Id.* at 157-58 (emphasis in original).

While the Second Circuit's *Iqbal* variation on the Supreme Court's *Twombly* theme leaves litigants with plenty to argue about in the context of a Rule 12(b)(6) motion to dismiss, I regard the plausibility standard as refined in *Iqbal* to be the governing law in this Circuit. *See Arar v. Ashcroft*, 532 F.3d 157, 174 (2d Cir. 2008) (citing *Iqbar* as declarative of "[t]he plausibility standard applicable to a Rule 12(b)(6) motion to dismiss"); *Ross v. Bank of America*, 524 F.3d 217, 225 (2d Cir. 2008) ("We recognize that *Bell Atlantic Corp. v. Twombly* requires a heightened pleading standard 'in those contexts where [factual] amplification is needed to render [a] claim *plausible*'" (citing and quoting *Iqbar*); *Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) ("In order to withstand a motion to dismiss, a complaint must plead 'enough facts to state a claim for relief that is plausible on its face.") (citing and quoting *Twombly*); *In re Elevator Antitrust Litigation*,

3

502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge [plaintiff's] claims across the line from conceivable to plausible.") (citing and quoting *Twombly*). Although *Twombly* was an antitrust case, the Second Circuit does not confine its holding to such cases. *See ATSI Communications, Inc. v. Shoar Fund, Ltd.*, 493 F.3d 87. 98 n.2 (2d Cir. 2007) ("We have declined to read *Twombly*'s flexible 'plausibility standard' as relating only to antitrust cases.") (citing and quoting *Iqbar*).

It is apparent, then, that in determining whether a complaint withstands a Rule 12(b)(6) motion to dismiss, *Twombly* as refined by *Iqbar* replaces the *Conley* "no set of facts" standard with a "flexible plausibility" standard. However, there is no reason to doubt the continuing vitality of two other well-settled principles.

First, on a Rule 12(b)(6) motion, courts must accept as true all well-pleaded factual allegations in the complaint, and draw all reasonable inferences in the plaintiff's favor. *See, e.g., Ruotolo v. City of New York*, 514 F.3d 18, 188 (2d Cir. 2008).

Second, and as a corollary to the first principle, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265. 286 (1986). *See also Amron v. Morgan Stanley, Inc.*, 464 F.3d 338, 344 (2d Cir. 2006) (in resisting a motion to dismiss, "bald assertions and conclusions of law will not suffice.") (citation omitted).

## II. THE AMENDED COMPLAINT

The allegations of Dilacio's Amended Complaint are described in detail in *Dilacio I*, 2008 WL 4449361, at *3-*4, and are not repeated here.

The Amended Complaint asserts three causes of action against all defendants:

4

First Cause of Action: Violation of Dilacio's rights conferred by Title I, section 101(a)(2) of the Labor Management Disclosure and Reporting Act ("LMRDA"), 29 U.S.C. § 411(a)(2). This claim is the source of the Court's subject matter jurisdiction, conferred by section 102 of the Act, 29 U.S.C. § 412.

Second Cause of Action: Wrongful termination of Dilacio's employment by the District Council as a Business Representative. This is a common law claim.

Third Cause of Action: Defamation. This is a common law claim.

### III. DISCUSSION

I discuss the defendants' motions to dismiss in inverse order.

### A. Motion of Defendant Callahan to Dismiss the Amended Complaint as to Him

Dilacio's performance as a Local 157 Business Representative was criticized, along with that of others, in a report Callahan, acting as the Independent Investigator, made to the District Council on November 13, 2007, following an investigation.[1]  The District Council terminated Dilacio after receiving Callahan's report. *Dilacio I*, 2008 WL 4449361, at *2.  The Amended Complaint alleges that Forde, "to entrench himself and eliminate potential rivals," directed "a purge of the incumbent Business Representatives of the District Council"; "[t]he pretext for the purge [by Forde of Dilacio]" was the investigation" by Callahan which falsely and inaccurately accused Dilacio and other Business Representatives of failing to perform their duties; and Callahan "knowingly assisted Forde in his 'purge'" because Callahan "is quite close to Forde" and also "had

---

[1] The report was formally submitted by Unitel. I will use the names Callahan and Unitel interchangeably.

a personal interest in conducting a 'sham'investigation" in order to strengthen his bid for reappointment as the II. *Id.*, at *3. The gravamen of the Amended Complaint is that the District Council's disciplinary actions against Dilacio "were spurious, unfounded, and in furtherance of Forde's scheme, aided and abetted by Callahan." *Id.*, at *4. This conduct, Dilacio claims, violated his rights under section 101 of the LMRDA, 29 U.S.C. § 411.

As to Callahan, Dilacio's LMRDA claim fails as a matter of law. § 411 enumerates certain rights of union members, and protects them from deprivation of those rights by the labor organizations to which they belong, or by union officials. "The principal reason for the LMRDA was to correct widespread abuses of power and instances of corruption by *union officials*, and to encourage democratic self-government in unions." *Franza v. International Brotherhood of Teamsters, Local 167*, 869 F.2d 41, 44 (2d Cir. 1989) (emphasis added). Section 102 of the LMRDA, 29 U.S.C. § 412, confers jurisdiction upon the district courts for civil actions by those whose § 411 rights have been violated. Such actions lie against labor organizations and "against individual defendants, at least if it is shown that they were acting *under color of union authority.*" *Morrissey v. National Maritime Union of America*, 544 F.2d 19, 24 (2d Cir. 1976) (emphasis added).

Callahan is not an official of the Union, and he was acting under his authority as the Court's Independent investigator. Dilacio argues in his brief that the allegations in the Amended Complaint are sufficient to characterize Callahan as an "agent" of the Union, and refers to the LMRDA, 29 U.S.C. § 529, which provides that "it is unlawful for any labor organization, or any officer, *agent*, shop steward, or other representative ... to fire, suspend, expel or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter." But the Amended Complaint does not allege an agency relationship between the Union

6

as principal and Callahan as agent. On the contrary: Callahan is alleged to be the Independent Investigator, and his relationship to the Union that of aider and abetter: the Amended Complaint alleges at ¶ 30 that "Callahan has knowingly lent his assistance to [Forde's] scheme through his purported 'investigation' of plaintiff."

Dilacio does not state a claim against Callahan under the LMRDA. It has long been the rule in this Circuit that "Title I only governs the relationship among unions and their members, and section 102 only allows a litigant to seek redress for an infringement of rights secured under Title I," *Phelan v. Local 305*, 973 F.2d 1050, 1056 (2d Cir. 1992) (citation omitted). In *Thompson v. New York Central Railroad Co.*, 361 F.2d 137, 145 (2d Cir. 1966), the Second Circuit, after quoting § 529, said: "The uniform current of authority in this Circuit has been to limit the jurisdiction of the District Courts under the Labor-Management Reporting and Disclosure Act to suits based on allegations that a labor organization or officer or *agent* thereof *acting in his official capacity* violated the terms of the Act." (emphasis added). The Amended Complaint cannot be read to allege that Callahan was acting in his official capacity as an agent of the Union. The Amended Complaint does allege that Callahan, as an aider and abetter, was acting in wrongful collusion with Forde, but that does not bring Dilacio's claim against Callahan within the LMRDA. *Cf. Phelan*, 973 F.2d at 1056 ("an employee has no claim against his or her employer under section 102, despite an allegation of collusion between the employer and the union." (citing *Thompson*).

Even if Dilacio's claims against Callahan fell within the LMRDA, the Amended Complaint's allegations concerning Callahan's conduct are deficient. The Amended Complaint charges that Callahan, a Court-appointed Independent Investigator, betrayed the Court's trust and concocted sham accusations against union members for his own personal gain: tantamount to an

7

accusation of fraud. Whether or not one regards such a claim as inherently implausible, at the very least Dilacio's claim against Callahan falls within the flexible plausibility standard, "which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbar*, 490 F.3d at 157-58.

Judged by that standard, Dilacio's complaint against Callahan misses the mark by a wide margin. His conclusory allegations are not supported by specifically pleaded facts sufficient to allow a reasonable inference of wrongdoing. For example, ¶ 18 of the Amended Complaint alleges "upon information and belief" that "Callahan had a personal interest in conducting a 'sham' investigation which would purport to uncover alleged wrongdoing by plaintiff and the other Business Representatives in order to demonstrate to the government that he should not be replaced as the Investigator and to solidify being supported by the District Council for his reappointment given his knowledge that the USA SDNY was opposed to him and also realizing that Judge Haight would likely replace him if both the District Council and the USA SDNY opposed his reappointment." This is not a well-pleaded allegation of fact. Dilacio has no personal knowledge of Callahan's subjective motivation. His allegation is no more than speculation and conjecture, without any specific allegations to support an inference of an improper motive. Dilacio's burden as a pleader was to allege facts showing that his claim of a dishonorable motive on Callahan's part is more plausible that an honorable one, namely, conducting an investigation into union members' wrongdoing, the purpose for which the Court appointed Callahan. Indeed, the Amended Complaint acknowledges in ¶ 6 that Callahan's company, Unitel, was the Court-appointed Independent Investigator, and in ¶ 13 that Callahan, acting in his capacity as II, conducted an investigation into the performance of Union Business Representatives that resulted in findings adverse to Dilacio and two other

8

individuals, leading to the Union's termination of Dilacio from that office. While Dilacio alleges in conclusory fashion that those two individuals "knuckled under Forde's threats" and resigned, while he refused because he had done nothing wrong, ¶ 13, it is at the very least equally plausible to believe that Callahan's investigation was properly motivated by his responsibilities and honorably conducted. Dilacio's Amended Complaint, entirely conclusory and lacking allegations of specific facts to support his theory of Callahan's wrongdoing, is insufficient under the governing flexible plausibility standard.

Dilacio's second and third causes of action, the common law claims, are also insufficiently pleaded as against Callahan.

The second cause of action is for wrongful termination of Dilacio's employment as a Union Business Representative. The District Council, as Dilacio's employer, had the power to terminate him, and exercised it. The Amended Complaint does not allege that Callahan had or shared that power, and of course, as the Court's Independent Investigator, he did not. Dilacio's brief at 5 concedes that "We cannot – and do not – quarrel with the proposition that because Callahan is not plaintiff's employer, he may not be held liable for a wrongful termination of plaintiff's employment." Dilacio's brief argues in favor of a different theory of recovery against Callahan, namely, tortious interference with contractual relations. I decline to consider that claim because a complaint cannot be amended by briefs of counsel. Ordinarily the proper procedure would be a motion to amend under Rule 15, but such a motion will not lie in this case for the reason stated *infra*.

The third cause of action is for defamation. Dilacio alleges that he was defamed by statements concerning his conduct as a Business Representative contained in the Termination Letter and Status Report issued by the District Council and disseminated to the union membership

9

following Callahan's report to the District Council. Amended Complaint, ¶ 42. Assuming *arguendo* that the statements in question were defamatory, there are no allegations in the pleading sufficient to support a claim that Callahan induced or caused their publication to union members, a requisite element of a defamation claim. *See, e.g., Van-Go Transport Co. v. New York City Bd. Of Educ.*, 971 F.Supp. 90, 102 (E.D.N.Y. 19970 (citing cases).

The question arises whether Dilacio should be granted leave to further amend his complaint in an effort to cure these pleading deficiencies. I deny leave to replead, on the ground of futility. That is because, quite apart from the considerations discussed *supra*, Callahan, as a Court-appointed officer, is absolutely immune from a suit such as this one.

In *Anderson v. Conboy*, No. 94 Civ. 9159, 1997 WL 177890 (S.D.N.Y. April 14, 1997), *rev'd on other grounds*, 156 F.3d 167 (2d Cir. 1998), I held that Kenneth Conboy, the Court-appointed Independent Review Officer ("IRO") in this case, had absolute quasi-judicial immunity from a private suit arising out of his investigation of a local union's activities and the resulting action he took. The relevant authorities are discussed in 1997 WL 177890, at \*4-\*8. Notwithstanding Dilacio's efforts to distinguish *Anderson*, Callahan the Court-appointed Independent Investigator is entitled to the same immunity from suit as Conboy the Court-appointed Independent Review Officer.

While the functions and responsibilities of these two Court appointees differ in some respects, Dilacio mischaracterizes Callahan's role and actions when he says that "Callahan's principal role is to assist the Union in complying with its statutory obligations under the LMRDA and to protect the rights of the membership," brief at 9, and that "Callahan's acts as II in submitting reports to the Union leadership for the leadership's evaluation" do not qualify for immunity. Callahan's mandate under the Court order appointing him is far more broad than that. The 1994

10

Case 1:08-cv-06959-CSH-THK Document 44 Filed 12/15/08 Page 11 of 23

Consent Decree entered in the government's underlying civil RICO action involving the District Council, familiarity with which is assumed, targets *inter alia* union corruption and unfair job referrals. This Court supervises and administers the Decree. In furtherance of those judicial functions, the Court has appointed two Independent Investigators. The first was Walter Mack. The second is Unitel, headed by Callahan, which succeeded Mack. The Court's order of appointment directs and authorizes Callahan to investigate union corruption, recommend disciplinary charges, and make referrals for further corrective action to the Union, the United States Attorney (which maintains its own watching brief over the Consent Decree), the United States Department of Labor, or law enforcement agencies. Callahan exercises his discretion in pursuing investigations commenced by Mack or initiating new ones.[2] He presents subpoenas to the Court for signature, and submits written reports to the Court every two months, as well as at the close of each investigation. Counsel for Callahan correctly state that "the Court, which supervises the Union pursuant to the 1994 Consent Decree, discharges its oversight responsibility based, in part, on the information it receives from Callahan." Brief at 11. As a practical matter, the Court could not discharge its judicial responsibilities imposed by the Consent Decree without the assistance of Independent Investigators. The policy considerations articulated in *Anderson* which militate in favor of immunity from suit for IRO Conboy are equally applicable to II Callahan:

> Proper implementation of the [Consent Decree] cannot feasibly be assured by the Court acting alone. As a practical matter, implementation depends upon the appointment by the Court of an experienced, energetic and able individual from the private sector. The practical necessity of such a appointment extends to all comparable cases. But litigants and trial judges would be hard

---

[2] The investigation by Callahan into Local 157, resulting in his report critical of Dilacio and others, was a follow-up on issues earlier identified by Mack.

11

> pressed to secure the assistance of able individuals in demanding cases, if those individuals had to worry about being sued for damages by persons or entities affected by their conduct in discharge of duties placed upon them by the courts. This is a policy consideration closely akin to that policy which grants immunity to judges.

1997 WL 177890, at *8.

This analysis is consistent with the functionality test of immunity articulated by the Supreme Court in *Forrester v. White*, 484 U.S. 219, 224 (1987): "[W]e examine the nature of the functions with which a particular official or class of officials has been lawfully entrusted, and we seek to evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions." In the case at bar, the investigative functions with which the Court's Independent Investigators are entrusted under their orders of appointment are derived from and intertwined with the Court's supervisory function under the Consent Decree. An Independent Investigator would be crippled in the exercise of those functions if union members could sue him for having been investigated.

Accordingly, Dilacio's Amended Complaint against Callahan will be dismissed in its entirety on the ground of Callahan's absolute quasi-judicial immunity from suit. In that circumstance, I deny plaintiff leave to replead.

## B. Motion of Defendants District Council and Forde to Dismiss the Amended Complaint as to Them

The District Council is a labor organization and Forde is its chief executive officer. In consequence, and in contrast with Callahan, Dilacio's claim against the Union defendants in the Amended Complaint's first cause of action satisfies the facial requirements of section 101 of the LMRDA. The present motion raises the question whether the allegations in that cause of action are

12

sufficient to state a viable claim under that section of the Act. This Court did not address that question in *Dilacio I*.

The question turns on considerations of subject matter jurisdiction and standing. In *Finnegan v. Leu*, 465 U.S. 431 (1982), former union business agents whose employment by the union had been terminated by its president after they supported the losing candidate in a union election sued the union and the president, alleging that their rights guaranteed by section 101 had been violated. The Supreme Court held that these individuals lacked standing to assert a section 101 claim. After examining the language and legislative history of the Act, the Court emphasized that the LMRDA was meant to protect *union members' rights as members,* not an individual's right to employment with the union. *Id.* at 439-41 & n. 10. The Court held that the Act does not bar the removal of policymaking union officials because such removal was "only an *indirect* interference with their membership rights." *Id.* at 440 (emphasis in original).

Dilacio, like the plaintiffs in *Finnegan*, was employed by the Union as a business agent. The *Finnegan* plaintiffs were terminated for political reasons. Dilacio was terminated, according to the Union, for failure to perform a business representative's duties. With respect to the applicability of the LMRDA, there is no substantive difference between the cases. Dilacio disputes the Union's charges, but *Finnegan* bars his LMRDA section 101 claim unless he can bring himself within an exception to the *Finnegan* rule.

The cases following *Finnegan* recognize two exceptions to the rule that a union's discipline of an individual union employee does not give rise to a claim under Title I of the LMRDA. The termination of an *elected* union official in retaliation for his outspoken criticism of the union may be a violation of Title I of the Act. *See Sheet Metal Workers' Intl Assoc. v. Lynn*, 488 U.S. 347

13

(1989). The Court reasoned that unlike an appointed staff member, the discharge of an elected official denies union members "the representative of their choice," *id.* at 355, and when an elected official is discharged, there is a more pronounced chilling effect on the members' free speech rights than when an appointed staff member is removed. *Id.* at 353-355. However, Dilacio does not come within this exception, because he was an appointed, not an elected, official of the Union at the time of his termination.

Another exception to *Finnegan* is created by a line of Second Circuit cases exemplified by *Franza v. International Brotherhood of Teamster, Local 671*, 869 F.2d 41 (2d Cir. 1989), where the Second Circuit recognized that when an appointed official "become[s] a symbol for a movement within the rank and file of union members . . . discipline of that person could be considered threatening to the exercise of Title I rights by union members generally." *Id.* at 45. Thus, the Second Circuit has permitted union employees to sue for violations of Title I where the employee is disciplined as "part of [a] purposeful and deliberate attempt . . . to suppress dissent within the union." *Maddalone v. Local 17, United Brotherhood of Carpenters*, 152 F.3d 178, 184 (2d Cir. 1998). Dilacio's allegations in his Amended Complaint reflect an effort to bring himself within that exception to *Finnegan*. To fall within the exception, a plaintiff must plead and prove by "clear and convincing proof" that his mistreatment "was part of a series of oppressive acts by the union leadership that directly threaten the freedom of *members* to speak out." *Maddalone,* 152 F.3d at 184 (emphasis added). The mistreatment must be more than "ad hoc personal retaliation;" it must be "part of a calculated and deliberate scheme to discourage dissent" among the union membership. *Id.* at 185. *See also Schermerhorn v. Local 100, Transport Workers of America, AFL-CIO*, 91 F.3d 316, 323 (2d Cir. 1995) ("A scheme to suppress dissent exists when as a result of established union

14

history or articulated policy . . . a purposeful and deliberate attempt [is made] by union officials to suppress dissent within the union."). The test is the same for policy making and non-policy making employees. *Franza*, 869 F.2d at 38. Other Second Circuit cases in point include *Schonfeld v. Penza*, 477 F.2d 899 (2d Cir. 1973); *Newman v. Local 1101, Communications Workers of America, AFL-CIO*, 570 F.2d 439 (2d Cir. 1978); *Cotter v. Owens*, 753 F. 2d 223 (2d Cir. 1985); and *Johnson v. Kay*, 860 F.2d 529 (2d Cir. 1988).

The question on the Union defendants' motion to dismiss is whether the allegations in Dilacio's Amended Complaint are sufficient to bring the pleading within this exception to *Finnegan*, thereby conferring standing upon Dilacio and subject matter jurisdiction upon this Court. The cited Second Circuit cases furnish guidance because they describe the circumstances that a terminated appointed union employee must plead and prove in order to take advantage of that exception.

In *Schonfeld*, 477 F.2d 899, the plaintiff was a union officer who was removed from office and declared ineligible for office for five years by the defendants District Council and International Union. The Second Circuit held that plaintiff stated a viable claim under Titles I and IV of the LMRDA, where the evidence showed that the District Council had been "for many years dictatorily and repressively run by Martin Rarback," plaintiff's political rival, and there had been several suits over a number of years against the same defendants involving the same "issues of member discipline and alleged electoral abuses." 477 F.2d 901 n. 2. The Second Circuit asserted the principle of "limiting initial federal court intervention to cases where union action abridging both Title I and IV can be fairly said, as a result of established union history or articulated policy, to be part of a deliberate attempt by union officials to suppress dissent within the union." *Id.* at 904. In

15

discussing the sufficiency of Sconfeld's complaint against the union, the court of appeals goes on

to say: "We think that the allegations in the complaints here were sufficient to meet this test.

Moreover, given the lengthy history of intra-District warfare over the years, see note 2 *supra*, these

were not *mere conclusory allegations* and certainly had some basis in fact . . . " *Id.* (emphasis

added). However, Judge Oakes's opinion cautions: "We by no means suggest . . . that the free

speech rights of union members are threatened or infringed upon every time a political dispute

occurs in a union and the dissident members interpret some action by union officials as a threat."

*Id.* at 903.

        In *Newman*, 570 F.2d 439, the plaintiff was removed by the union from his position

as a shop steward on the ground that he had engaged in disruptive conduct at a union meeting. The

Second Circuit, reversing the district court, held that Newman's claim did not fall within Title I of

the LMRDA. The court of appeals said:

> Only when there is clear and convincing proof that the union action
> in this case, the decertification of Newman as a shop steward, was
> part of a purposeful and deliberate attempt by union officials to
> suppress dissent within the union, should the federal court act under
> LMRDA. Otherwise we are bound to adhere to our longstanding
> policy against intervention in the internal affairs of unions, which are
> best left to the officials chosen by the members to manage those
> operations except in the very limited instances expressly provided for
> by the Act.

570 F.2d at 445-446 (citations and internal quotation marks omitted).[3]

        In *Cotter*, 753 F.2d 223, a union member asserted a Title I claim against the union,

on the ground that his removal from the local's nuclear safety committee was in retaliation for his

___

[3] On remand, the district court granted Newman relief and the Second Circuit affirmed,
597 F.2d 833 (2d Cir. 1979), in an opinion which does not depart from the principles quoted in
text.

16

dissident activities. On defendants' motion for summary judgment, the Second Circuit held that a genuine issue of fact existed "as to whether the removal of Cotter from the Committee was not merely an isolated act of retaliation for political disloyalty, but was part of a 'purposeful and deliberate attempt to suppress dissent within the union.'" 753 F.2d at 230 (citing and quoting *Schonfeld*). In support of his claim that his removal was "part of an over-all at scheme to suppress dissent," Cotter offered proof of a "history of past and present litigation between his dissident group, or its precursors, and the union leadership," dating back "to 1970, when a New York court compelled the union to submit to the membership the dissident group's proposed by-laws amendment," and extending to 1980, when "Judge Motley issued a preliminary injunction ordering the Local to reinstate a dissident shop steward who had been removed for his activities" in a rank and file dissident group, and beyond, to litigation still pending in this Court in 1985, in which Judge Ward "twice enjoined the Local" from improper conduct designed to block by-law amendments. *Id.* at 229.

In *Johnson*, 860 F.2d 529, plaintiff, a local union president, obtained a preliminary injunction against other union officers staying a membership referendum on proposed amendments to the local's constitution. The Second Circuit, affirming the district court, held that plaintiff stated a viable claim under section 101 of the LMRDA for the violation of her rights of association and expression u under the Act. The court of appeals identified this exception to *Finnegan*:

> Notwithstanding the limitations on the scope of the LMRDA articulated in *Finnegan v. Leu*, an attack largely focusing upon a union officer may, under some circumstances, "directly threaten the freedom of members to speak out," (citing and quoting *Cotter*), and therefore violate the LMRDA, where "as a result of established union history or articulated policy" there is "a deliberate attempt by union officials to suppress dissent within the union." (citing and quoting *Schonfeld*). We conclude that the allegations of the present complaint meet this test.

17

860 F.2d at 536. The court then reviewed the complaint's allegations in detail. I need not recount

them all. It is sufficient for present purposes to quote the Second Circuit's summation of them:

> These allegations of disruption and intimidation at Delegate
> Assembly meetings and the seizure of the union headquarters by the
> Kay faction clearly reflect more than random acts of individuals
> directed solely at Johnson as President. Specific allegations of
> coordination and planning are made. Moreover, the nature, intensity
> and extent of the of the defendants' scheme, including threats of
> physical harm directed at Johnson, and the attempts to block her
> normal channels of communication with other members during the
> period before the vote on the proposed constitutional amendments,
> the planned disruption of District Assembly meetings designed to
> frustrate union members from supporting Johnson, and the seizure of
> the union building, would strongly tend to chill union members who
> desired to exercise their rights in a fashion disapproved of by the Kay
> faction.

*Id.* at 537. Not surprisingly, the Second Circuit concluded: "These allegations state a claim under

the LMRDA." *Id.*

In *Franza*, 869 F.2d 41, a union member claimed that his discharge from employment

by a health service plan by a union official serving as chairman of the plan violated his rights under

section 101 of the LMRDA. The district court dismissed his claim after trial. The Second Circuit

affirmed, stating "the thrust of decisional law is that a direct infringement of membership rights or

a real threat to the democratic integrity of the union is required to state s claim cognizable under §

101 of the Act. The rights enumerated in § 101 do not serve as job security provisions; instead, they

strengthen union democracy, by making direct interference actionable." *Id.* at 48 (citing cases). The

court concluded: "Here, where Franza's status as a member is unrelated to his employment by the

Plan, his loss of that employment is not the infringement of a right to which Title I's protections

attach." *Id.*

18

In *Schermerhorn*, 91 F.3d 316, dissident union officers asserted that actions of other officers violated section 101 of the LMRDA. The Second Circuit, upholding a jury verdict in plaintiffs; favor, reviewed its decisions in *Johnson, Franza, Schonfeld,* and *Cotter,* and approved this jury charge by the trial court:

> A plaintiff may prove that an otherwise lawful act by a union official violated the LMRDA, where the complained of act was part of a series of oppressive acts by the union leadership that directly threatened the freedom of members to speak out. In order to prevail on such a claim, a plaintiff must prove that the complained of act was not merely an isolated act of retaliation, but was part of a purposeful and deliberate attempt to suppress dissent within the union. . . . In order to prevail on their purposeful scheme theory, plaintiffs must show by clear and convincing evidence that the union action was part of a purposeful and deliberate attempt by union officials to suppress dissent within the union.

91 F.3d at 323. As revealed by its answers to a special verdict form, the evidence satisfied the jury that the adoption of certain attendance and flyer distribution policies "were not reasonably related to the protection of Local 100 as an institution, many of the defendants' attempts at excluding the Plaintiffs from meetings and their lodging of charges against the Plaintiffs interfered with the Plaintiffs' rights to meet and assemble freely with other union members, ... and much of the defendants' conduct, including the posting of notices cancelling the May 25, 1992 special meeting, was part of a scheme to suppress dissent in Local 100." *Id.* at 321.

The rule to be derived from these and similar Second Circuit cases is clear. In order to state a viable claim under Title I, section 101 of the LMRDA against a union and its officers, a union member whose employment was terminated by the union, and brings an action against the union and its officers for infringement of his section 101 rights, must adequately plead that his termination was part of the union's deliberate attempt to suppress dissent within the union or directly

19

interfere with other rights guaranteed by section 101. Often, such a claim is pleaded by allegations of a series or pattern of acts by the union which impact the rights of a number of dissident members or groups. A union's action against a single individual is cognizable under the Act only if that individual adequately pleads that he has become "a symbol for a movement within the rank and file members," so that "discipline of that person could be considered threatening to the exercise of Title I rights by union members generally." *Franza*, 869 F.2d at 45.

Dilacio's Amended Complaint does not meet that test. Dilacio alleges that "for the past several years," he was a "vocal and well-known advocate" as the result of "his running for Vice President of the District Council for at least two election cycles," but was "asked by Forde not to run against an [unidentified] incumbent but to wait until that incumbent retired which was always represented to {Dilacio] as soon." Amended Complaint, ¶ 9. The reasonable inference to be drawn is that Dilacio accepted that representation and was content to wait in the wings until the "incumbent" retired, only to be disappointed by Forde's subsequent actions "in or about 2007," *id.* at ¶ 10, which obstructed Dilacio's hopes for election. Such allegations, based upon Dilacio's personal knowledge, may be regarded as well-pleaded for Rule 12(b)(6) analysis, but do no more than assert a narrow personal claim of promises, reliance, reneging and retaliation, which the cited cases make plain is not cognizable under section 101.

However, Dilacio attempts to bring his differences with Forde within the Act by additional, broader allegations, found in ¶¶ 10-12, 27-28, and 31 of the Amended Complaint, which read as follows:[4]

---

[4] The paragraph numbers are omitted.

In or about 2007, defendant Forde, with the knowing assistance of Callahan and upon information and belief, the consent and knowledge of the President and Vice President of the District Council that make up the governing executive body of that organization, conceived and began to implement a scheme designed to consolidate his power in the District Council and eliminate and suppress any actual or potential dissent or opposition or threats to his tenure and his continued exercise of power.

Plaintiff, as a long-standing and well-respected leader in the Union and District Council, was perceived by defendant Forde as a serious threat to his power and a potential rival to his reelection as Executive Secretary/Treasurer of the District Council or for the position of Vice President or President which would have also presented a threat to his power and control. Indeed, it was common knowledge in the District Council that plaintiff was considering a run for Executive Secretary/Treasurer or other District Council in the next scheduled election.

Pursuant to Forde's scheme to entrench himself and eliminate potential rivals, and to suppress dissent and silence opposition, and with the knowing assistance of the independent investigator, Callahan, in or about November 2007, Forde directed a purge of the incumbent Business Representatives of the District Council.

Upon information and belief, both the termination of plaintiff as Business Representative and the attempt to expel him from membership in the District Council is part of an overall scheme by defendants (I) to suppress opposition to and dissent from membership of the District Council to the actions of the incumbent leadership of the District Council, including Forde; and (ii) to prevent opposition to such incumbent leadership (specifically, plaintiff) from challenging them in the next election, which is currently scheduled for December 2008. Indeed, the termination of plaintiff by Forde was in direct retaliation for plaintiff's stated and vocal interest to run against Forde or possibly Vice President or President which would pose a threat to his leadership and in order to thwart plaintiff's potential bid for the office of Executive Secretary-Treasurer or other office in the next District Council election and also his questioning of his leadership, and with Callahan's assistance sought to discredit and eliminate him.

Upon information and belief, the "purge" of the Business Representatives by Forde in November 2007 had the desired and

21

> intended effect of chilling and suppressing any dissent to Forde from members of the District Council.
>
> Upon information and belief, defendants intend to rely upon the termination of plaintiff as Business Representative (and, possibly, his expulsion from membership in the Union) as a justification for denying plaintiff eligibility to be a candidate for Executive Secretary-Treasurer or any other position. Were this to occur, plaintiff (as well as the membership of the District Council) will be denied their rights as members of the District Council to participate freely in union affairs without fear of retaliation.

These allegations do no more than parrot the elements of a section 101 claim articulated by the cited Second Circuit cases. But the sufficiency of the specific facts pleaded or proved in those cases casts a spotlight upon the insufficiencies of Dilacio's pleading. Dilacio's allegations are conclusory in their characterizations of the states of mind of Forde and the union members, and devoid of any specific facts, historical or articulated, demonstrating a union plan to suppress dissent among union members or otherwise directly infringe all members' rights under the Act. The well-pleaded facts in these allegations – and they are difficult to discern – do no more than reveal Dilacio's belief that Forde treated him unfairly in connection with Dilacio's potential candidacy for a Union office, that he had not announced at the time the Amended Complaint was filed. Such allegations of personal conflict fail to state a viable claim under section 101 that the freedom of all union members had been impacted by Forde's conduct.

It will not do for Dilacio to protest that he has had no pretrial discovery. As *Schonfeld* and *Johnson* demonstrate, the viability of a Title I claim may be tested on a Rule 12(b)(6) motion to dismiss the complaint for failure to allege facts sufficient to state a claim under the Act. The question on this motion to dismiss is not whether Dilacio might discover some proof in support of

22

his claim; rather, it is whether he has alleged sufficient facts to plead a cognizable claim and justify further litigation. For the reasons stated, Dilacio has not done so.

Accordingly, the Union defendants' motion to dismiss the first count of the Amended Complaint under Rule 12(b)(6) was granted. Because Dilacio amended his complaint in response to the defendants' first motion to dismiss, the Court denies leave to replead, it being evident that Dilacio has fashioned the best pleading that he can and it is inadequate. The Court declines to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c)(3).

Dated: New York, New York
December 15, 2008

_____
CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE

23